[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14826
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cr-00047-LJA-TQL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSHUA GRIFFIN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(April 2, 2020)

Before WILSON, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

On January 11, 2017, police officers arrived at Joshua Griffin's home in response to a report that someone in the house had pointed a gun at another person. The officers arrested Griffin, conducted a protective sweep of the home, and then obtained a search warrant. Based on evidence recovered from that search, a grand jury indicted Griffin on three charges: possession with intent to distribute methamphetamine (Count 1), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii)[1]; possession with intent to distribute marijuana (Count 2), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D); and possession of cocaine (Count 3), in violation of 21 U.S.C. § 844(a).[2] The district court denied Griffin's motion to suppress the evidence obtained from the search of his home and the case went to trial. A jury convicted Griffin on all three counts.

Griffin timely appealed. On appeal, he argues that the district court erred in denying his motion to suppress the evidence recovered from his home because the circumstances did not permit a warrantless search. Griffin also argues that the

---

[1] 21 U.S.C. § 841(a)(1) provides that "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

[2] In relevant part, that section provides that "[i]t shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner . . ." 21 U.S.C. § 844(a).

2

evidence was insufficient to support his convictions. Because the officers conducted a valid protective sweep of Griffin's home and because the evidence is sufficient to establish all of the elements necessary for his convictions, we affirm.

## I.

A. Protective Sweep of Griffin's Home

On January 11, 2017, four Pelham, Georgia police officers responded to a 911 call reporting that Griffin had pointed a gun at a woman.[3] Officers went to the home of the two women who reported the incident: Feidyanna Stewart and Jayleen Stewart (the "Stewart sisters"). The Stewart sisters explained that while they were inside Griffin's home, Feidyanna Stewart and Griffin began arguing. During the argument, Griffin asked another man—whom they identified as "Big Man"—"to give him that 'Thang,'" in reference to a black pistol. When Griffin pointed the pistol at Feidyanna Stewart, the Stewart sisters left the house. The officers went to Griffin's house following their conversation with the Stewart sisters.

Approximately 20 minutes after the officers received the call from the Stewart sisters, they knocked on Griffin's front door. Griffin came to the storm door, and eventually stepped out onto his porch and identified himself to officers. At that point, the officers handcuffed him. During his interactions with Griffin at

---

[3] We present these facts as laid out in Captain Adam Lamb's affidavit for a search warrant, Griffin's Motion to Suppress, and Officer Lamb's testimony during the motion to suppress hearing. Griffin does not dispute these facts on appeal.

3

the front door, Captain Lamb observed the strong odor of marijuana emanating from inside the home.

After handcuffing Griffin, the officers performed a protective sweep of the home. Lamb testified that based on his experience and the Stewart sisters' statements—that Griffin had a firearm, which was not on his person, and that there was another man in the home—he was concerned that the others in the house could destroy evidence, hide the gun, or attack the officers.

Upon entering the home, which generally smelled of marijuana, the officers found two other individuals: Zachary Walker and James "Big Man" Griffin (no relation to Joshua Griffin). During the protective sweep, another officer observed a plastic bag that had a strong odor of marijuana coming from it. Lamb then obtained a search warrant for Griffin's residence, identifying the odor of marijuana inside of the home and the bag that smelled of marijuana as probable cause for the search.

B. Griffin's Motion to Suppress

Prior to trial, Griffin moved to suppress any evidence seized from the officers' initial entry into his home and the resulting search warrant. Griffin argued that the officers violated his Fourth Amendment rights because they did not have probable cause for the search warrant until *after* they illegally entered the home to conduct a baseless protective sweep. After hearing Captain Lamb's

4

testimony and reviewing the body camera footage, the district court found that "the house was not breached" and the "officers did not do anything improper."  The district court therefore denied Griffin's motion to suppress evidence obtained from the search.

C. Evidence Presented at Trial

During the trial, testimony was presented that in executing the search warrant, officers found in Griffin's bedroom: 45.18 grams of marijuana in a plastic container; vehicle deeds, which all listed Griffin's name and address, "less than a foot away" from the marijuana; a Crown Royal bag containing less than 1 gram of cocaine, approximately 20 grams of methamphetamine, and a digital scale; and a ledger that had names and numbers written inside it.  In the kitchen, the officers found "fold-top sandwich bags."  Additionally, Griffin had $982 in cash on his person.

Rod Williams, the assistant chief of police at the City of Pelham Police Department, testified as an expert in drug distribution.  With regard to the 45 grams of marijuana, he testified that although "the weight was something that could go either way . . . when you couple all of the other facts in with it, . . . it's indicative of someone who's distributing marijuana."  Williams also noted that in cases where drugs are intended for personal use, he would expect to find evidence like smoking devices or partially smoked pieces of marijuana, which were not

5

found in this case.  As to the methamphetamine, Williams testified that the amount of the drug (approximately 20 grams), considered together with the packaging materials, digital scales, and $982 in cash found on Griffin, indicated that Griffin intended to distribute the drug.  Moreover, there was no evidence, such as syringes or pipes, indicative of personal use.

Griffin testified in his own defense.  He testified that on January 11, 2017, he had invited Walker and "Big Man" to his home to celebrate his birthday.  When he saw the police officers arrive, he hid the container of marijuana—which he admitted that he owned but was solely for his personal use—under his bed.  He denied that the ledger notebook was his (although he admitted making certain entries in it), instead stating it belonged to "everyone that's in the house."  Griffin further testified that he had been smoking marijuana for hours that day and if the police officers had looked in the trash can, they would have found "cigar wrappers and whatnot" indicating that he had been smoking.  But he testified that he had "no idea" about the Crown Royal bag containing the methamphetamine and cocaine and that those drugs were not his.  He maintained that either "Big Man" or Walker must have brought the Crown Royal bag containing drugs into the bedroom, but did not see them bring it in.  Griffin stated that the large sum of money found on his person was money he earned from "odd jobs doing carpentry."  Griffin also testified that, in 2009, he pleaded guilty to possession of crack cocaine with the

6

intent to distribute.  At the conclusion of the trial, the jury convicted Griffin on all counts.

## II.

We review the denial of a motion to suppress as a mixed question of law and fact; the district court's factual findings are reviewed for clear error while its application of the law is reviewed *de novo*.  *United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019).  All facts are construed in the light most favorable to the prevailing party below.  *Id.*  "The individual challenging the search has the burdens of proof and persuasion."  *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).  Review for clear error is deferential, and "we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed."  *United States v. Sosa*, 777 F.3d 1279, 1300 (11th Cir. 2015) (quoting *United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009).  A district court's choice between multiple permissible views of the evidence cannot be clear error.  *United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016).  "[W]e may affirm the denial of a motion to suppress on any ground supported by the record."  *United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010).  We review the sufficiency of the evidence *de novo*, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict."  *United States v. Schier*, 438 F.3d 1104, 1107

(11th Cir. 2006). The district court's denial of "motions for a judgment of acquittal will be upheld if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000).

## III.

### A. Motion to Suppress

Griffin argues that there were no circumstances justifying the initial protective sweep of his home.[4] We disagree.

Following a valid arrest, officers may conduct a protective sweep for their safety. *See Maryland v. Buie*, 494 U.S. 325, 337 (1990) ("The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."); *United States v. Yeary*, 740 F.3d 569, 580 (11th Cir. 2014) (holding that a protective sweep of the home was valid after officers "saw a

---

[4] In his reply brief, Griffin raises a related argument that the officers arrested him without probable cause. But at the suppression hearing, Griffin affirmatively stated that he did not wish to argue whether there was probable cause to arrest him. Nor did Griffin raise this argument in his initial brief other than a conclusory statement that officers detained him "without probable cause and exigency." Therefore, Griffin has abandoned this argument. *See Johnson v. United States*, 340 F.3d 1219, 1228 n. 8 (11th Cir.2003) ("Arguments not raised in the district court are waived."); *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994) ("Issues that clearly are not designated in the initial brief ordinarily are considered abandoned.").

8

firearm in plain view [and] . . . learned of the presence of two unknown individuals in the residence" because the officers "reasonably suspected that they were in danger"). Moreover, the protective sweep of a home is not necessarily limited to arrests made *inside* the home: it extends to situations where the suspect is arrested in a "portion of a structure" outside of the residence, such as an open porch. *Burgos*, 720 F.2d at 1526.

The district court did not err in denying Griffin's motion to suppress because reasonable suspicion of danger to officer safety justified the officer's brief search of Griffin's home. Based on the Stewart sisters' statement, which indicated that Griffin possessed a gun and that others were in the home, and the lack of a gun on Griffin's person, the officers had reasonable suspicion to believe that there was a gun in the residence and another individual in the home and that, therefore, they could be in danger. *Buie*, 494 U.S. at 337; *Yeary*, 740 F.3d at 580. This belief justified the protective sweep of Griffin's home.

B. Sufficiency of the Evidence

Griffin next challenges the sufficiency of the evidence that he possessed and intended to distribute the drugs found in his home. Specifically, he asserts that the evidence that he possessed cocaine and possessed methamphetamine with the intent to distribute it was insufficient because nothing revealed that Griffin owned those drugs or even knew those drugs were in his home. He also claims that the

9

evidence of possession of marijuana with intent to distribute was insufficient because the amount of marijuana was consistent with personal use and he had used the marijuana on the day of his arrest.  Both arguments fail.

To obtain a conviction for possession of a controlled substance, the government must show that the defendant "knowingly or intentionally" possessed a controlled substance.  21 U.S.C. § 844(a).  To establish possession of controlled substance with intent to distribute, "[t]he [g]overnment [has] to 'prove three elements: (1) knowledge; (2) possession; and (3) intent to distribute.'"  *United States v. Flanders*, 752 F.3d 1317, 1332 (11th Cir. 2014) (quoting *United States v.* Poole, 878 F.2d 1391 (11th Cir. 1989) (per curiam); 21 U.S.C. § 841(a)(1).

"Evidence of surrounding circumstances can prove knowledge." *United States v. Poole*, 878 F.2d 1389, 1392 (11th Cir. 1989).  "Possession may be shown by constructive possession," which "exists when a defendant has ownership, dominion, or control over an object or the premises where the object is found." *Flanders*, 752 F.3d at 1332.  Intent to distribute can be proven through circumstantial evidence.  *United States v. Capers*, 708 F.3d 1286, 1301 (11th Cir. 2013).  We have stated that the quantity of drugs and existence of implements commonly used in connection with the distribution of drugs, like scales, can show the intent to distribute.  *Id.*  Other implements of distribution include drug ledgers, cash, and bags for packaging drugs, as well as "the lack of paraphernalia used to

10

consume the drug." *United States v. Mercer*, 541 F.3d 1070, 1076 (11th Cir.

2008).

    i.       Possession of Cocaine and Methamphetamine[5]

The government presented sufficient evidence to show that Griffin

knowingly possessed the methamphetamine and cocaine. The evidence revealed

that Griffin exercised "dominion" and "control" over the Crown Royal bag

containing the methamphetamine and cocaine because that bag was found in

Griffin's bedroom within Griffin's house. *See Flanders*, 752 F.3d at 1332.

Moreover, near the Crown Royal bag, the officers found multiple car titles listing

Griffin's name and address, a ledger that Griffin had written in, and the marijuana

that Griffin admitted to owning. With this evidence, a jury could have reasonably

found that Griffin knowingly possessed the methamphetamine and cocaine.

Although Griffin proffered an alternative explanation for how the Crown Royal

bag of drugs landed in his bedroom—that Walker or "Big Man" put it there—the

jury was free to disbelieve and reject this testimony. *United States v. Williamson*,

339 F.3d 1295, 1301 n.14 (11th Cir. 2003); *see also United States v. Allison*, 908

F.2d 1531, 1535 (11th Cir. 1990) ("The jury may view the defendant's false

explanatory statement as substantive evidence proving guilt.").

---

[5] Griffin admits that he possessed the marijuana. He therefore only challenges the "intent to distribute" element of that charge.

11

ii. Intent to Distribute Methamphetamine and Marijuana

The evidence also supports the jury's finding that Griffin intended to distribute the methamphetamine and marijuana.  As an initial matter, the amount of the drugs supports a finding that Griffin intended to distribute them.  Williams, the government's expert on drug distribution, stated that the weight of the methamphetamine alone—21 grams—indicated that it was intended for distribution.  And although Williams acknowledged that the weight of the marijuana (45 grams) was such that it "could go either way" regarding whether Griffin intended to sell it, he concluded that the surrounding evidence was "indicative of someone who's distributing marijuana."  Indeed, the record is rife with indicia of drug distribution: in addition to the drugs themselves, the officers recovered a set of scales, vehicle deeds bearing Griffin's name, a ledger (which Griffin disputed ownership but admitted to writing in) containing names and contact information, plastic sandwich bags, and $982 in cash.  *See Capers*, 708 F.3d at 1301; *Mercer*, 541 F.3d at 1076.  Also telling was what the officers did not find in Griffin's home: items indicating personal drug use, such as syringes, pipes, or smoking devices.  *See Mercer*, 541 F.3d at 1076.

Against this evidence, Griffin argues that the amount of marijuana was consistent with personal use and he had been smoking it earlier in the day, as evidenced by the unrecovered refuse in the trash can.  And he maintains that he did

12

not possess and was not aware of the methamphetamine.  Again, we cannot reverse

a conviction solely because the defendant put forth an innocent explanation.

*Campo*, 840 F.3d at 1258; *Williamson*, 339 F.3d at 1301 n.14.  The government

presented enough evidence to allow a reasonable jury to conclude that Griffin

intended to distribute the methamphetamine and marijuana.  *Capers*, 708 F.3d at

1301.  Accordingly, we affirm.

**AFFIRMED.**